UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL J. QUILLING,

   Plaintiff,           Hon. Robert Holmes Bell

v.                   Case No. 1:03-cv-236

TRADE PARTNERS, INC., et al.,

   Defendants.

_____/

**REPORT AND RECOMMENDATION**

   This matter is before the Court on the Receiver's Motion to Approve Sales Procedures and to Authorize Sale of Policies Free and Clear of Interests (Dkt. 834). This matter was referred to me by the Honorable Richard Alan Enslen for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Hearings were held, testimony taken, and exhibits introduced on this motion on February 24-25, 2005, March 2 and 10, 2005, and April 14, 2005. For the reasons stated, the Court recommends that the motion (Dkt. 834) be granted.

I.  BACKGROUND

   Pursuant to an Order dated April 15, 2003, and a subsequent Order dated July 21, 2003, the Court appointed Bruce S. Kramer as Receiver for Trade Partners, Inc. (TPI) and various related trusts and limited liability companies, and charged the Receiver with the duties and obligations to hold, manage, and dispose of various assets (the "Receivership"). Among the assets of the Receivership are approximately 835 insurance policies (hereinafter referred to as the "viatical portfolio"), with a face death benefit value of approximately $170 million. By prior Order of the

Court, the Receiver was allowed to use escrow funds and policy maturities (death benefits) to pay future policy premiums as they accrued (Dkt. Nos. 51, 52 and 54), and was allowed the ability to borrow funds from Macatawa Bank to pay premiums should it be necessary (Dkt. Nos. 29, 31 and 33). To date, the Receivership has not needed to borrow any funds to pay premiums, nor does the Receiver currently project that this will be necessary in the future.

The Receiver has had the viatical portfolio valued by two independent consultants (Dkt. No. 470). The Receiver had previously filed a motion for authority to market and sell certain insurance policies (the "AIDS portfolio) (Dkt. No. 545). This motion was granted after notice and hearing (Dkt. No. 573). The motion was withdrawn because no bona fide offer was received acceptable to the Receiver or Examiner (Dkt. No. 776).

The Receiver is presently administering, inter alia, the approximately 835 life insurance policies (the viatical portfolio) with a face value of death benefits of approximately $170 million. Included within the portfolio are 695 insurance policies where the insured/viator has been diagnosed with HIV/AIDS (the AIDS portfolio). These policies have a face death benefit value of approximately $46 million, and require an annual premium in the aggregate amount of $490,000.00. The annual premiums for the non-AIDS policies for the period August 1, 2003 through July 31, 2004 were $4,690,770. The estimated premiums for the entire viatical portfolio for the period August 1, 2004 through July 31, 2005 are $5,389,842.07. There are presently sufficient funds available to pay premiums as they accrue. (See, Financial Report, Dkt. No. 622).

The processing of claims continues. As of April 28, 2005:

- ! 6,593 claims have been filed:

- ! 121 claims have been withdrawn:

! 5,651 claims have been submitted to the Court, totaling $114,852,047.88;

! 141 claims have been reviewed/agreed to since the April 1, 2005 motion to allow and to adjust claims, totaling $4,874,380.71;

! 81 claims have been objected to, requesting a reduction/modification of the claim to a total of $1,372,678.38;

! 599 claims are pending review and total approximately $60 million;

! It is estimated that total claims will be approximately $181 million.

The Receiver has had numerous discussions with various potential purchasers, and the Receiver, the Examiner, and their consultants have analyzed several proposals. However, previously the Receiver had received no firm offer to purchase the AIDS portfolio and the only written offer to purchase the portfolio was a percentage payout or sharing formula over a substantial period of time. Subsequent to the notice of withdrawal of the motion to sell the portfolio, the Receiver was presented with an all-cash offer for the entire portfolio in the amount of $43 million. The potential purchaser is Universal Settlements International, Inc. (Universal Settlement). Its president is Tony Duscio. Universal Settlement has made a $5 million escrow earnest deposit and has escrowed the balance of $38 million to another escrow account. (See Exhibit 1 attached to Dkt. No. 834).

## II. LEGAL STANDARD

The Court clearly has the authority to direct property to be sold by a Receiver in this equitable proceeding. *See, generally, Moore's Federal Practice*, Vol. 13, Ch. 66 (Matthew Bender, 3d ed. 1997); *Federal Practice and Procedure*, Vol. 12, §§ 2981-86; *Clark on Receivers* (Anderson 2d ed. 1929); *see also, e.g., First National Bank of Cleveland v. Shedd*, 121 U.S. 74 (1887); *SEC v. Forex Asset Management v. Waller, Receiver*, 242 F.3d 325 (5th Cir. 2001). A receiver owes a duty

to preserve and protect the property of the estate for any person who is interested in the estate of which he has been made a receiver.  *Citibank, N.A. v. Nyland, (CF8) Ltd.*, 839 F.2d 93, 98 (2d Cir. 1988); *Eller Indus., Inc. v. Indian Motorcycle Mfg., Inc.*, 929 F. Supp. 369, 372 (D. Colo. 1995); *County of Oakland v. City of Detroit*, 784 F. Supp. 1275, 1286 (E.D. Mich. 1992).  Acting pursuant to his authority, the Receiver has successfully taken steps to preserve the portfolio, such that there is no real danger of it being seriously compromised and its long-term stability is assured.  (Exhibit 5 - Page 51, Exhibit 6 - Page 52, Exhibit 7 - Page 90, Exhibit 8 - Page 29, Exhibit 9 - Page 33[1]).  Now the Court must decide whether it is in the best interest of the Receivership estate to sell the portfolio now or to manage it over an extended period of time, perhaps five to ten years.  Proper notice (Exhibit 22) of the motion (Exhibit 21) has been given because the Receiver mailed the notice and the motion to all claimants and also posted it on the Receiver's and the Examiner's web sites.

      The following individuals and entities have objected to the proposed sale, and their objections will be addressed, each in turn.  Gerald Abraham, M.D. was a major TPI investor and has a substantial claim in the assets of the Receivership estate (Claim No. A-03823).  Macatawa Bank has also objected.  Macatawa Bank was an escrow agent and lender for TPI  It is a defendant in a related case, *Jenkins, et al. v. Macatawad Bank Corporation*, Case No. 1:03-cv-00321.  *Jenkins* is a purported class action asserting breach of contract, breach of fiduciary duty, and negligence and gross negligence by Macatawa Bank in connection with its activities concerning TPI's viatical portfolio.  Patrick J. McNamara has also objected, as he claims a perfected security interest in Transamerica Occidental Life Insurance Policy No. 600-29-359.  This claim is the subject of a

---

[1] Various exhibits were offered and admitted at hearings in connection with the Receiver's Motion.  The exhibit number refers to the exhibit.  The page number refers to its sequential location in the exhibit book.

pending Order to Show Cause, which has been taken under advisement for Report and Recommendation. New Era, a major insurance company investor, has joined by letter (Dkt. 987) in the objections of Dr. Abraham and Macatawa Bank.

III. ANALYSIS

    A. Whether the Portfolio Has Been Adequately Marketed

One of the objections that has been made to the sale of the viatical portfolio is that it has not been adequately marketed. The Court disagrees. The uncontroverted testimony was that the viatical or life settlement industry is a small market, and that the number of legitimate entities capable of purchasing the portfolio is even smaller. Testimony was also clear that the salability of the portfolio was well known within the viatical, or life settlement, market. Confidentiality agreements were executed with twenty bona fide and pre-qualified potential purchasers who had shown some interest in purchasing the portfolio and wanted to perform due diligence to this end (Exhibits 14 and 15). Copies of the only written offers the Receiver obtained prior to that of Universal Settlements International, Inc. were introduced (Exhibit 36). The Court does not find that advertisements in newspapers and periodicals would have increased the possibility that a higher purchase price could be obtained.

    B. The Proposed Sales Price in Light of the Value of the Portfolio

There is no question in the Court's mind that, should the Receiver (or some other legitimate entity) hold and continue to manage the portfolio, it is **possible** that a higher value could be ultimately obtained for the investors. The theoretical present value of the portfolio also exceeds the offered $43 million. The Receiver obtained two actuarial valuations of the portfolio, one by Lewis & Ellis (Exhibit 11) and one by Fasano Associates (Exhibit 10). Testimony including cross-

examination of representatives of the companies was heard.  The methodologies and assumptions utilized were consistent, the primary difference being the discount rates each of them used.  The Lewis & Ellis present values (Exhibits 11 and 43) are as follows:

| Discount Rate | 6% | 8% | 10% | 12% | 15% | 20% |
|---|---|---|---|---|---|---|
| Total Portfolio | 89,838,311 | 80,538,316 | 72,917,240 | 66,581,838 | 58,888,718 | 49,407,953 |

The Fasano Associates present values, as of January 1, 2004 are:

| Total Portfolio | Non-AIDS | AIDS | Discount Rate |
|---|---|---|---|
| 59,465,121 | 54,818,563 | 4,646,558 | 20% |

Although the Court did not find anything suspect or wrong with the actuaries' valuations of the portfolio, the Court finds that the market simply did not support a price this high.  There is no question that viaticals, although a legal investment, have been subject to fraudulent activity in some cases.  There is a possibility, though not yet proven, that some of the AIDS policies may have been "clean sheeted," which involves a misrepresentation as to the status of the health of the insured.  Thus the insurance company might have grounds to contest payment on the death of the viator.  Also the life expectancy of the AIDS viators generally has increased dramatically because of improvements in treatments.  (See Exhibit 35).

Another factor which contributes to or detracts from value is the life expectancy of the insured.  Very frequently these have not been accurate, i.e., the insured has outlived the life expectancy.  (See Exhibit 34).  Some of the policies' life expectancies are unknown.  There is a problem getting more correct, updated life expectancies because the insured has already "cashed out"

on the policy and presumably has no incentive to cooperate in updating life expectancy through an independent medical examination or otherwise.  The Court agrees with the Receiver that the fair market value is what a willing buyer will pay a willing seller in the absence of any coercion.  Should it be in the best interest of the Receivership estate to sell the portfolio, there is little question that $43 million is the highest the market will bear under all of the facts and circumstances.

One cogent argument that was made by objectors was that the investors knew at the time they made investment that they would have to wait for the death of the viator.  The objectors argue, somewhat persuasively, that there is no reason to change the rules of the game at this stage.  However, the Court notes the following.  It is highly unlikely that the investors will ever get 100% return of even their out-of-pocket investment.  Thus, one may assume that their confidence in the investment must be very shaken.  Further, as to the age of those who have actually filed claims with the Receiver, 77% are over 51 years of age, and 30% are over 71.  The Court has also had some contact, although only anecdotal, with some investors, and it is clear that many of them, because of their dire financial circumstances, could not have understood the nature of the investment.  There is one gentleman who takes a bus back and forth to almost every hearing in this matter.  There is another couple who has attended some of the hearings but has had to leave early because they could not afford to pay for parking any longer.  Another investor was in danger of losing a family farm that had been in the family for generations.

Further, an imperfect but noteworthy poll taken by the Examiner (Exhibits 31 and 32) shows that the majority of the investors would rather receive less money sooner than to wait five years or more for a greater return.  Finally, unsolicited contacts made by investors to the Receiver show that a very small percentage of the investors want the Receiver to hold and manage the viatical portfolio.

In summary, it is not clear that many of the investors understood the nature of their investment or the risks involved. In this regard, the Court notes that TPI's principal, Thomas J. Smith, pled guilty on October 7, 2004 to engaging in fraudulent interstate transactions and also to engaging in mail fraud and aiding a racketeering enterprise. The Court is not confident that the solicitation of investors was not tainted with fraud. Thus, the Court has no assurance that many of the investors, particularly the smaller ones, truly understood the nature of their investment.

C. The Sale is in the Best Interest of the Estate

As noted, there is no question that the actuarial present value of the viatical portfolio is higher than the $43 million offering price. There is also no question that, theoretically, more value could be realized by holding and maintaining/managing the portfolio for five years or longer. yet the five and ten year projections of maturities involve future events which may not occur at the time projected.

Exhibit 30 illustrates that of the 5,866 claims, a very small percentage constitute large investments. The overwhelming majority are investments of less than $50,000.00, with 2,417 being less than $10,000.00.

Given that only three investors objected to its sale, it seems that the overwhelming investor sentiment supports the sale of the portfolio. Further, continued management of the portfolio would continue to incur management costs, premium costs, and costs associated with the continued services of the Receiver and Examiner. Finally, presumably the Court's continued involvement would be required.

D.   The Objecting Parties

1.   Dr. Gerald Abraham, M.D.

Dr. Abraham, as noted above, has a sizeable investment in the portfolio. He has objected to its sale most vigorously. He, along with others, also claims an interest in a specific policy or policies. However, among the thousands of individual investors, he and Dr. McNamara stand virtually alone in their objection. It is recommended that his objection be overruled for two reasons. First, an almost lone dissenter should not be able to undermine what is in the best interest of the Receivership estate and thousands of other investors. Second, if he ultimately prevails on his claim that he is entitled to a beneficial interest in certain policies, appropriate distribution from the Receivership assets can be made.

2.   Patrick J. McNamara

Dr. McNamara claims a perfected security interest in a particular insurance policy, No. 600-29-359. If he prevails on his claim, he likewise may obtain an appropriate distribution from the Receivership assets.

3.   Macatawa Bank

Macatawa Bank has also objected vigorously to the sale of the viatical portfolio. Presumably, Macatawa Bank is motivated by the pending purported class action against it. The TPI investors will have no loss, or at least no ascertainable loss, until final distribution from the Receivership estate is made.

Macatawa Bank also argues that the Court should await a decision by the Sixth Circuit Court of Appeals on an interlocutory appeal of *Liberte Capital Group v. Capwill*, 321 F.Supp.2d 899 (N.D. Ohio 2004). *Liberte Capital* also involved the viatical settlement industry and has other significant

similarities to the instant action.  For example, federally indicted principals were involved.  The Court faced the question of whether the appropriate method of distribution involved a pro rata allocation, or "pooling" arrangement, as has been ordered in this case, versus an ownership interest or "tracing" theory.  The rationale behind the "pooling" or pro rata theory is that policies are saved from lapsing by use of other investor funds in the Receivership being advanced for premium payments.  The Court chose to put all *Liberte Capital* investors on an equal footing, finding it "mandated in the wake of this financial fiasco." *Id.* at p.805.   The *Liberte Capital* court approved a pro rata distribution to the investors in the viatical life insurance investment program.  Basically, the policies were considered "pooled" even though some investors may have thought they had an interest in a particular policy.  The *Liberte Capital* court also certified the issue to the Sixth Circuit Court of Appeals pursuant 28 U.S.C. § 1292(b).

     Macatawa argues that, depending on the Sixth Circuit's decision in the *Liberte Capital* case, sale of the viatical portfolio might in effect scramble an egg that cannot be unscrambled.  The Court disagrees.  If the Sixth Circuit disapproves of pooling, the Court, acting in equity, would have to make an equitable distribution taking the Sixth Circuit's holding into account.

IV.   SUMMARY

For the reasons stated in this Report and Recommendation, the undersigned recommends that the motion (Dkt. 834) be **granted** and the viatical portfolio be sold for the price of $43 million because it is the most viable method by which to return some money to investors on a relatively prompt basis, and is in the best interest of the Receivership estate.

Respectfully submitted,

Date:  May 23, 2005                                     /s/ Ellen S. Carmody
                                                        ELLEN S. CARMODY
                                                        United States Magistrate Judge


OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).