UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL J. QUILLING,

        Plaintiff,                            Hon. Robert Holmes Bell

v.                                      Case No. 1:03-cv-00236

TRADE PARTNERS, INC., et al.

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

INTRODUCTION

Trade Partners, Inc. ("TPI") was a corporate front for fraud -- a Ponzi scheme perpetrated by Tom Smith. The Receiver has objected to certain claims made by the "New Era" entities and by ancillary complaint is seeking affirmative relief. New Era Life Insurance Company ("New Era Life"), New Era Life Insurance Company of the Midwest ("Midwest"), Philadelphia American Life Insurance Company ("PALIC") and New Era Enterprises, Inc. ("Enterprises"), collectively "New Era," have filed a Motion to Dismiss the TPI Receiver's Ancillary Complaint (Dkt. 921) filed both (a) as the Receiver's objection to New Era's claims to Receivership assets, and (b) to assert affirmative causes of action against New Era. Both derive from the same set of facts (Dkt. 761) ("Ancillary Complaint"). The undersigned recommends that the motion be granted in part and denied in part.

PROCEDURAL BACKGROUND

The Receiver filed three actions against New Era, all arising out of the same facts: (a) in the Receivership proceeding the Receiver filed the ancillary complaint captioned above which is pending before Chief Judge Robert Holmes Bell; (b) in the Chapter 11 bankruptcy case of TPI Desert Carmel, LLC, formerly known as Trade Partners Gateway Center, LLC, the Receiver filed a complaint styled, *Trade Partners Gateway Center, LLC v. New Era Life Insurance Company, et al.*, Adversary Case No. 1:04-cv-00786 (W.D. Mich.), also pending before Chief Judge Robert Holmes Bell; and (c) in the Chapter 11 bankruptcy case of Trade Partners Greenville, LLC, the Receiver filed a complaint styled, *Trade Partners Greenville, LLC v. New Era Life Insurance Company, et al.*, Adversary Case No. 04-88971 (W.D. Mich. Bankruptcy Court), which is pending before Chief U.S. Bankruptcy Judge Joanne C. Stevenson.  The New Era claims at issue are as follows.

| Claim # | Claimant | Amount | Secured | Basis |
|---------|----------|--------|---------|-------|
| 4574 (Objection) | New Era Life | $4,076,061 | Yes | Secured loan to Trade Partners Music Valley Inn, LLC ("Music Valley Inn") |
| 4575 (Objection) | New Era Life | $1,701,749 | Yes | Secured loan to Trade Partners Greenville, LLC ("Greenville Warehouse") |
| 4576 (Objection) | New Era Life | $2,373,247 | Yes | Secured loan to Trade Partners Gateway Center, LLC ("Desert Carmel") |
| 4577 (Objection) | PALIC | $1,186,624 | Yes | Secured loan to Trade Partners Gateway Center, LLC ("Desert Carmel") |
| 4578 (Objection) | New Era Midwest | $1,186,624 | Yes | Secured loan to Trade Partners Gateway Center, LLC ("Desert Carmel") |
| 4583 (Objection) | New Era Life | $1,426,062 | No | Purchase of viatical membership interests |

| Claim # | Claimant | Amount | Secured | Basis |
|---------|----------|--------|---------|-------|
| 4584 (Objection) | PALIC | $798,595 | No | Purchase of viatical membership interests |

## STATEMENT OF FACTS

1. **Claims Objections Under the Receiver's Distribution Plan**

The Court adopts the statement of facts presented by the Receiver essentially wholesale because the posture of this matter is on a motion to dismiss the ancillary complaint and there has been no development of the facts. Under applicable law, all well pleaded facts must be taken as true.[1] The Receiver's statement of facts is supported by reference to the ancillary complaint.[2] Through TPI, Smith and others perpetrated a massive Ponzi scheme. The Receiver holds the invested funds in the form of the cash that was remaining upon his appointment, cash received for matured viaticals, and various assets purchased with investor funds (A.C. at 7-8). The Receiver proposed a claims procedure (Dkt. 200) which the Court approved (Dkt. 223). Pursuant to those procedures, New Era presented claims (A.C. at 6-7). The Receiver has objected to New Era's claims (A.C. at 6-8), and alleged affirmative claims against New Era for support of and involvement in the fraudulent scheme (A.C. at 9-12).

The Court takes notice that thousands of other investors also made claims, which the Receiver has proposed be assigned various levels of priority in a proposed distribution plan (Dkt.

---

[1]References to the ancillary complaint will be by "A.C. at ___ or A.C. at ¶ ___."

[2]To avoid repetition, it should be understood that the allegations contained in the ancillary complaint are just that -- allegations. "Alleged" and "allegedly" are frequently omitted to avoid repetition. It remains to be seen whether the Receiver can prove those allegations.

577).  The Receiver's distribution plan provides for pro rata compensation based on net cash lost by each investor.  (Id.).  The assets have been pooled and treated as a single constructive trust.  (Id.)  The distribution plan treats the pooled investors the same.  (Id.)

The ancillary complaint states that New Era should not recover more than its net cash loss.  (A.C. at 8).  Alternatively, New Era can fairly be characterized as a Class B claimant (trade debt or similar creditor) (Id.), which class will receive nothing under the planned distribution (Dkt. 577).

The overwhelming majority of the typical TPI investor claims have now been reviewed and assigned a net cash loss figure pursuant to the procedures established by the Court.  The Court has rejected investor claims insofar as they seek the anticipated profit from the investment.  It also has rejected claims insofar as they seek any interest.  Finally, it has offset claims by any amount the investor did recover prior to the Receivership.

The typical TPI viatical investor was relatively unsophisticated.  Investment offerings were set up in such a way that the investor was provided a return when the underlying asset performed as predicted.  Investors providing funds for monthly income program offerings ("MIP Investments") or a general inventory loan provided funds based upon the security of the viaticals held by TPI itself, and waited for their notes to mature to be paid based upon the maturity of those viaticals.

2.    **New Era's Claims**

New Era purchased inventory (viaticals) for Smith to sell to the typical investor (A.C. at 5).  New Era made a profit when Smith sold the inventory.  (Id.)  New Era joined with Smith in creating ventures designed to mask the financial weakness of both New Era and TPI from their respective customers (A.C. at 5-6).

The ancillary complaint portrays New Era as a sophisticated company, a group that provides life insurance, group health insurance, and annuities (A.C. at 3).  The New Era management team conducts significant due diligence before making any substantial investments.  (Id.)  Finally, the New Era companies collectively reported 2003 assets of over $250 million.  (Id.)  New Era was aware that fraud was rampant in the viatical industry as a whole (A.C. at 4).  New Era understood prior to becoming involved with TPI that the viatical trading industry had experienced many instances of fraudulent conduct by brokers, and recognized TPI as a viatical broker.  (Id.)

Under Texas regulations, New Era could not purchase viaticals from TPI and could not sell viatical interests.  According to the complaint, TPI established a series of LLC entities, specifically to purchase one or more viaticals and to sell those viaticals to investors (A.C. at 5).  New Era provided the capital necessary to purchase the involved viaticals, and was repaid its capital with interest when the viaticals were sold to TPI investors.  (Id.)  New Era made profits on the viatical sales transactions, which continued from the fall of 1999 through mid-2001 (A.C. at 4-5).

New Era ultimately lost money acting as an inventory lender, not because of misrepresentations of Smith but because viatical sales fell off (A.C. at 5).  At this point New Era and Smith also had the common problem of hiding the default from their respective constituencies.  In New Era's case the problem was with its state regulators and maintaining its rating (A.C. at 5-6).  New Era claimed never to have had a loan in default (A.C. at 5).  The funding transactions were characterized as loans to the LLCs.  (Id.)  Smith assisted New Era in masking the loan defaults by engaging in rollover transactions for New Era.  The ancillary complaint alleges that these were sham transactions (A.C. at 4-5).  With the defaults thus disguised, New Era actually maintained the claim

through May 2003 that it had never had a loan in default, even though New Era knew that TPI was a collapsing fraud scheme (A.C. at 4).

3.      **Claims Related to Real Estate Ventures**

The Receiver claims that Smith and New Era management created three real estate ventures in 2002 (A.C. at 5) as the viatical sales scheme began to fail (A.C. at 4-6).  According to the Receiver, New Era appeared to act as a lender but loaned more than was necessary to complete the transaction in order to permit TPI to pay back to New Era the outstanding balances due on the inventory loans.  (Id.)  A portion of the loan proceeds was paid not in cash but in the form of New Era annuities, i.e., a loan was made using a loan.  These loans were consummated for the purpose of disguising TPI's default on its loan to New Era, to inflate New Era's balance sheet, and to provide assurance for TPI investors (A.C. at 4, 5, 6, 8-10).  The Receiver further claims that another motive for New Era was that its investment would be treated as a loan secure by real estate, when TPI ultimately collapsed (A.C. at 6).  In the Spring of 2003 New Era took additional steps to improve its position in anticipation of TPI's collapse (A.C. at 6).  Allegedly, since 1999 it had been involved in a venture with TPI known as TradeArk.  (Id.)  Over the succeeding years, investor funds were bled to support TradeArk.  There still remained land owned by TradeArk as of Spring 2003.  (Id.)  According to the Receiver,  just before his appointment, TradeArk was dissolved and New Era was allowed to take the real estate ostensibly sold and New Era claimed its loan had been paid in full in the Spring of 2004.  (Id.)

4.      **New Era's Receivership Claims**

New Era contends that it should recover its investment in full (A.C. at 6-9).  Specifically, New Era and PALIC present five claims, assigned claim numbers 4574 through 4577 and 4583

(A.C. at 6-7).  Claim No. 4583 is based upon MIP investments by New Era Life and PALIC (A.C. at 7).  Claim Nos. 4576 and 4577 are based upon loans New Era Life and PALIC, respectively, made in connection with a real estate project known as Desert Carmel.  (Id.)  Claim No. 4575 is based upon a loan made by New Era Life to fund, among other things, the purchase of a warehouse in Greenville, Michigan.  (Id.)  Claim No. 4574 arises from a New Era Life loan made to fund, again among other things, the purchase of Music Valley Inn.  (Id.)

5.      **The Receiver's Determination of New Era's Claims**

The Receiver investigated these claims and determined not to compensate New Era from the remaining investor funds.  (Id.)  According to the Receiver, the objections are straightforward and plainly present the Receiver's position.

New Era and PALIC collectively claim that they should be paid $1.95 million based upon various MIP loans.  With respect to the inventory loan claims, this is the Receiver's position:

a.      The Receiver first objects to affording these entities a greater recovery than any other TPI investor.  According to the Receiver, based on principles of equity, including constructive trust law, no person who suffered a loss in the TPI scheme should receive more than a pro rata share of the available assets based upon the person's actual net cash loss.  According to the Receiver, the total cash deposited by New Era and PALIC is $2,269,050.43 and the total cash received back is $1,783,575.22.  This leaves a net cash loss to New Era and PALIC of $485,477.21.  According to the Receiver, alternatively, if New Era contends that it is different than a typical TPI investor, it should be assigned a Class B rating and recover nothing.

b.      The Receiver further objects, to paying even New Era's net cash loss, because New Era has already received a disproportionately large return, and it has unclean hands.  A record of MIP

investments indicates that New Era received a disproportionate return.  Equitably, therefore, according to the Receiver, New Era should not be provided a further return.  Moreover, if the Receiver is correct and New Era's disproportionate recovery was achieved because it participated in the scheme, its inventory lending actually made possible a portion of the TPI scheme, and it should recover nothing.

       c.      The Receiver further objects to paying New Era's net cash loss because it claims such loss is offset by the Receiver's claim against New Era under the affirmative claims set out in the ancillary complaint.  Therefore, according to the Receiver, New Era's obligations to the Receivership estate should entirely offset its claims  (A.C. at 7-8).

       With respect to the real estate claims, the Receiver has stated that, with respect to the Desert Carmel, Greenville and Music Valley loans, New Era asserts a right to priority of payment over the other creditors, based on state real estate law.  According to the Receiver, New Era should not be afforded any such preferential treatment because the policy of real estate law in fostering secured commercial transactions should not be in play when a transaction is established as a sham or for the purpose of facilitating a fraudulent scheme, or for the purpose of granting an unfair advantage to one victim of a fraud over another.  The Receiver claims that the party whose loan is designed to create a false appearance and thereby facilitate a fraud (according to the Receiver both as to government regulators and as to TPI investors) should not be entitled to the rights of the secured creditor either under state law or in an equitable receivership or bankruptcy proceeding.  The Receiver states that the debt should be entirely equitably subordinated.  The Receiver asserts that the security interest should be equitably rescinded and/or voided under applicable fraudulent transfer statutes, the assets should be pooled and distributions made pro rata based upon respective net cash losses of all persons

who were defrauded in the TPI scheme.  The Receiver further asserts that under principles of equity and/or pursuant to the bankruptcy code (as applicable in the parallel adversary proceedings), New Era's claims should be equitably subordinated.  In this regard, the Receiver urges that it should be considered that New Era received Ponzi payments and made profits even after the imposition of the Receivership in connection with the TradeArk transaction.  Alternatively, the Receiver asserts that New Era's claims should be reduced based upon the circular transactions and resulting failure of and/or absence of consideration, in whole or in part (A.C. at 8-9).

6.    **The Receiver's Causes of Actions Against New Era**

The ancillary complaint alleges that New Era's conduct is actionable based on causes of action for (a) aiding and abetting breach of fiduciary duty; (b) aiding and abetting corporate waste; (c) conspiracy; (d) claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. (RICO); and (e) fraudulent transfer (A.C. at 9-12).  According to the Receiver, this is because not only did New Era obtain a benefit for itself, it obtained for itself various preferences and advantages that warrant the denial of its claims, the same conduct also gives rise to affirmative causes of action.

ANALYSIS

In Count 1-A of the ancillary complaint, the Receiver lodges various objections to the claims asserted by New Era based upon 1) the prior recovery of these entities from TPI before the initiation of the Receivership proceeding; 2) the nature of the claims as well as the claimants compared to the typical and otherwise innocent investments and investors of TPI; 3) these entities' participation and furtherance of the very scheme that led to the Receivership; and 4) the offset of the related claims for relief by the Receiver against New Era.

1.      **The Receiver Has the Power to Determine Claims Subject to Court Review**

The Receiver argues that a receiver has the power to adjust and compromise a matter in dispute when a claim is submitted.  II CLARK ON RECEIVERS, § 655 at 1147 (Anderson 3d ed. 1959), *citing Samuels v. E.F. Drew & Co.*, 7 F.2d 764 (S.D.N.Y. 1924).  The determination of the Receiver is subject to the supervising court for review.  CLARK § 655 at 1147-48.  The claim approved by the court becomes the final judgment as to the petitioning creditor's claim.  *Id.; see also, Gelberg v. Richardson*, 82 F.2d 314 (9th Cir. 1936).

In reviewing the Receiver's determination of claims, courts are guided by the principle that a compromise of a claim made against the estate should be effected where "it is done for the best interest of the receivership and the estate under the control and possession of the court."  CLARK § 655 at 1148; *see also S.E.C. v. Forex Asset Mgmt., LLC*, 242 F.3d 325, 331 (5th Cir. 2001).  Review of an equity receiver's determination should be entrusted to the court's sound discretion, because the administration of claims made against a receivership's assets is an exercise of equitable power.  *See Forex Asset Mgmt.*, 242 F.3d at 331; *U.S. v. Durham*, 86 F.3d 70 (5th Cir. 1996).

2.      **Procedures for Determining Claims Have Been Established by the Court**

In a federal equity receivership proceeding, a receiver's claim determination, and subsequent efforts to seek confirmation thereof, is not a lawsuit by the receiver against the claimant.  Instead, it is an equitable proceeding governed by the discretion of the court.  *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *S.E.C. v. Hardy*, 803 F.2d 1034, 1037-40 (9th Cir. 1986); *McFarland v. Winnebago South, Inc.*, 863 F. Supp. 1025, 1034 (W.D. Mo. 1994).

Procedurally, the court may employ summary procedures as opposed to plenary proceedings under the Federal Rules, for claim objections in receivership proceedings.  *Id.* The claimant is given

an opportunity to present evidence and argue the merits of the claimant's objection.  Once the claimant has had the opportunity to present evidence and argue the merits of the claimant's objection, due process has been satisfied and the court may properly enter an order allowing, disallowing, or subordinating the claim.  *Elliott*, 953 F.2d at 1560; *Hardy*, 803 F.2d at 1040; *McFarland*, 863 F. Supp. at 1034.

3.      **The Complaint Follows the Court's Procedures for Determination of Claims**

The Court approved summary procedures for claim administration on October 7, 2003 (Dkt. 223).  Specifically, the Receiver is ordered to file a motion to allow claims on a quarterly basis.  If there are no objections to the proposed claims lodged within thirty days, the Court enters an order allowing the particular claims.  Further, on a quarterly basis the Receiver is also to file a motion to disallow claims, and a hearing to consider the disputed claims is to be held at such time as the court directs (Dkt. 223).  Further, allowance of claims does not in itself establish any priority, as the ultimate payment of the claim priority of payment is to be established by future order of the court.

The Receiver is in full compliance with the notice and hearing requirements discussed above. A receiver is not required to treat the claims administration process as full blown federal court litigation which would result in excessive costs to the estate.  Instead, summary proceedings are appropriate.  *See, e.g., Elliott*, 953 F.2d at 1566 ("A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets."). Whether or not the New Era Life parties are entitled to the full protection of the Federal Rules of Civil Procedure on the Receiver's affirmative claims against them will be addressed below.  The Receiver has set forth specific grounds for treating New Era's claims as general creditor claims rather than investor claims.  It has further set forth additional equitable grounds for the disallowance

or subordination of New Era's claims.  The complaint is quite specific in its objections to New Era's claims, certainly sufficient to satisfy notice pleading requirements.  New Era's responses focus on the merits of the Receiver's objections rather than the narrow issue of whether the Receiver has sufficiently pled such objections.  Because of the posture of New Era's motions, the Receiver's factual allegations and reasonable inferences therefrom must be taken as true.  New Era should be given ample opportunity to develop the factual basis for its denial of wrongdoing and to argue the merits later.  Its motion to dismiss the Receiver's objections should be denied.

4.     **The Receiver's Affirmative Claims Against the New Era Entities**

      a.     The Court has Authority to Equitably Subordinate New Era's claims
          and Recharacterize Them as Equity.

District courts in receivership cases have "broad powers and wide discretion" to fashion appropriate relief.  *S.E.C. v. Basic Energy and Affiliated Resources, Inc.*, 273 F.3d 657, 668 (6th Cir. 2001).  Thus, even if this Court concludes that New Era's claims should be treated as investor claims, the Court has the discretion to modify the priority scheme to subordinate New Era's claims or recharacterize them as equity.

The Court has the authority under its equitable powers to apply the equitable subordination provision of the bankruptcy code by analogy in federal receivership cases.  *See, e.g., Gaff v. FDIC*, 919 F.2d 384, 393-94 (6th Cir. 1990).  In spite of New Era's assertion that "there is no reported case permitting use of this doctrine [equitable subordination] outside of bankruptcy," (New Era brief at 13) it is clear that recharacterizing debt to equity has not been created by the bankruptcy code but rather as an equitable remedy that bankruptcy courts can evoke under their general equitable powers. *In re Autostyle Plastics, Inc.*, 269 F.3d 726, 748 (6th Cir. 2001).  Courts in equity receivership cases have even broader equitable powers than bankruptcy courts. *See, Forex Asset Mgmt.*, 242 F.3d at

331-32.  Therefore, courts in equity receivership cases have ample discretion to recharacterize debt as equity.

> b.      The Receiver Has Sufficiently Stated a Claim to Equitably Subordinate
>          New Era's Claims

The cause of action for equitable subordination requires only two elements:  1) inequitable conduct by the claimant that 2) causes injury to another creditor or confers an unfair advantage on the claimant.  *Autostyle*, 269 F.3d at 744.  In bankruptcy cases, a third element is added:  3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code. *Autostyle,* 269 F.3d at 744.

The complaint includes allegations to support all elements of the cause of action for equitable subordination against New Era.  Knowingly conspiring with and supporting an insider who is perpetrating a securities fraud would, if true, plainly constitute inequitable conduct that resulted in unfair advantages to New Era and damage to TPI and its investors.  In particular, ¶¶ 16-19, 21 and 23 of the ancillary complaint contain numerous allegations of inequitable conduct by New Era resulting in unfair advantages to New Era.  In addition, ¶¶ 21, 22 and 24 allege various ways that TPI and other creditors were injured by New Era's inequitable conduct.  Whether or not Plaintiffs can prevail on their cause of action for equitable subordination is not the issue before the Court at this point. New Era will have an opportunity to argue the merits later.  The Court at this time simply does not know whether the Receiver's claims can be proved.  However, the Plaintiffs' cause of action for equitable subordination must be sustained at this juncture if relief could be granted under any set of facts that could be proved consistent with the allegations in the complaint.

   c.  The Receiver Has Stated A Claim to Recharacterize New Era's Claims
      As Equity

   A cause of action to recharacterize a claim to equity requires only that the circumstances show that a debt transaction was actually an equity contribution *ab initio*. *Autostyle*, 269 F.3d at 747-48. Recharacterization is not limited to claims of insiders, and no showing of injury to other creditors is necessary. The ancillary complaint, at ¶¶ 16-19 and 21 contains numerous allegations which, if true, would justify treating New Era's purported loans as contributions to equity. New Era's reliance on the *Roth Steel* factors cited by the Sixth Circuit in *Autostyle* and its reliance on *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1298-99 (10th Cir. 2004), do not support New Era's position that this claim should be dismissed at this point. Again, New Era is relying on these cases to support the argument that the Receiver will not prevail on the merits of his claims for equitable subordination and recharacterization. The Receiver has at least stated sufficient facts to entitle him to pursue his claims through discovery and present them to the Court for ruling on the merits. Again, whether the Receiver will ultimately prevail, is unknown to the Court at this point. However, sufficient facts have been stated to support a cause of action under applicable law.

5.  **The Receiver Has Stated a Cause of Action for Aiding and Abetting Breach of
   Fiduciary Duty**

   The ancillary complaint opens with a lengthy factual statement that sets forth New Era's alleged conduct in financing Smith, working with him in mutually maintaining the facade that allowed TPI to continue for as long as it did, and ultimately working with him to extricate themselves (A.C. at 3-6). The ancillary complaint then incorporates those allegations, and states that New Era knowingly participated in a breach of fiduciary duty committed by Tom Smith and others, officers and employees of TPI, to its own benefit. The complaint also alleges how the

breaches of fiduciary duty caused direct damages and contributed to support the overall fraudulent scheme (A.C. at 9-10).

The elements of a claim for aiding and abetting of breach of fiduciary duty are: 1) that an independent wrong exist; 2) that the aider or abetter know of the wrong's existence; and 3) that substantial assistance be given to effecting that wrong. *Carson Fischer, PLC v. Standard Fed. Bank*, 2005 WL 292343, *6 (Mich. Ct. App., Feb. 8, 2005). The Receiver has clearly put the New Era entities on constructive notice of the facts constituting the alleged breach, and the elements are clearly alleged.

New Era contends that the allegations must meet the higher standard of pleading required for fraud claims by Fed. R. Civ. P. 9(b). The Receiver counters that this is not a fraud claim. Further, as stated by the Receiver, the only authority suggesting a higher standard is the unpublished opinion of *Krieger v. Gast*, 2000 WL 288442 (W.D. Mich., Jan. 21, 2000). As stated in that opinion of the Honorable Gordon J. Quist, a divergence of opinions exists among the courts with regard to whether Rule 9(b) applies to a claim for aiding and abetting breach of fiduciary duty. The Receiver argues that because Rule 9(b) speaks expressly to averments of fraud or mistake, the Court should not rewrite the rule to also apply to a claim of aiding and abetting a fiduciary duty. This conclusion is consistent with the holdings of *Leatherman v. Tarrant County*, 507 U.S. 163 (1993), and *Carlon v. Thaman (In re NationsMart Corp. Sec. Litig.)*, 130 F.3d 309 (8th Cir. 1997), where the courts found that Rule 9(b) should not apply to causes of action not enumerated therein. The Court has found no Sixth Circuit authority on point.

Regardless, in the Court's opinion the higher standard has been satisfied.  Paragraphs 7-24, 34 and 36 of the ancillary complaint paint a vivid picture of the alleged steps taken by New Era to keep TPI alive as it knew it was sinking deeper and deeper into hopeless insolvency.

If the Receiver is able to prove the allegations of the complaint, New Era knew full well that TPI was a Ponzi scheme in which they had invested millions of dollars in the hopes of profiting from the sales to investors.  According to the complaint, when that faltered, New Era entered into several transactions with TPI to keep the scheme afloat, and took actions to hide TPI's deepening financial crisis.  In addition, New Era allegedly took actions in concert with Smith to improve their position over other investors and creditors to prepare for the day when TPI's fraudulent scheme would collapse.  The allegations of the complaint, if believed, go further than New Era merely sitting back and accepting the benefits of the TPI scheme.  The Court finds that the cause of action for aiding and abetting breach of fiduciary duty has been stated with sufficient particularity to allow the New Era entities to defend against the claim.  Because the Court is otherwise recommending that portions of the motion to dismiss be denied, the Court recommends that the motion to dismiss this count be denied without prejudice pending whether more particularity can be developed through discovery.

6.     **The Receiver Has Not Stated a Claim for Aiding and Abetting Corporate Waste**

Presumably, since TPI is a Michigan corporation, Michigan law would control this cause of action.  Curiously, the Court has found no Michigan authority or any Sixth Circuit authority recognizing a cause of action in Michigan for aiding and abetting corporate waste.  Although the Court has previously recognized causes of action for aiding and abetting fraud and breach of fiduciary duty under New York law, *see, Glidden Co. v. Jandernoa, et al.*, 5 F. Supp.2d 541, 556-57 (W.D. Mich. 1998), given the lack of Michigan authority and the plethora of causes of action

-16-

asserted by the Receiver against New Era, the Court recommends that this cause of action be dismissed without prejudice subject to its reinstatement if the Receiver submits, within 30 days of the date of the Court's order, authority that Michigan recognizes a cause of action for aiding and abetting corporate waste.

7.      **The Receiver Has Not Stated a Claim for Conspiracy**

The Receiver claims that the New Era companies conspired with TPI.  A civil conspiracy is "an agreement or preconceived plan, to do an unlawful act."  *Bear v. Miller Brothers Creamery*, 112 N.W.2d 463, 469 (Mich. 1961).  The elements for a cause of action for civil conspiracy in Michigan are:  (1) a concerted action; (2) by a combination of two or more persons; (3) to accomplish a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means; (4) causing damage to the plaintiff.  *Fenestra, Inc. v. Gulf American Land Corp.*, 141 N.W.2d 36, 48-49 (Mich. 1966); *Mays v. Three Rivers Rubber Corp.*, 352 N.W.2d 339, 341 (Mich. Ct. App. 1984).  However, the Michigan Court of Appeals has stated, citing the Michigan Supreme Court, "An allegation of conspiracy, standing alone, is not actionable."  *Magid v. Oak Park Racquet Club Assoc.*, 269 N.W.2d 661, 664 (Mich. Ct. App. 1978) (*citing Roche v. Blair*, 9 N.W.2d 861 (Mich. 1943)).  Mere agreement to commit an unlawful act is not actionable.  A civil conspiracy action is one for damages arising out of the acts committed pursuant to the conspiracy.  *Fenestra*, 141mN.W.2d at 48-49; *Crum v. Sheppard*, 255 F. Supp. 994, 998 (W.D. Mich. 1966), *aff'd* 407 F.2d 490 (6th Cir. 1967).

Therefore, the Court recommends that the Receiver's allegations of a separate cause of action based on civil conspiracy be dismissed, and further recommends that ¶¶ 38 and 39 of the ancillary complaint be allowed to remain, as they further flesh out the facts alleged by the Receiver.

8.     **The Receiver Has Not Stated a RICO Claim With Sufficient Particularity**

To prove a RICO claim, a plaintiff must plead and prove, inter alia, that the defendant

committed at least two RICO-predicate offenses.  18 U.S.C. § 1961 (5).  The RICO-predicate

offenses are those found in 18 U.S.C. § 1961(1).  The Receiver claims that its ancillary complaint

has stated RICO-predicate offenses consisting of mail fraud and wire fraud.  It further references the

fact that Tom Smith pleaded guilty to acts of mail and wire fraud in the criminal case of *U.S. v.*

*Thomas J. Smith*, Case No. 1:04-cr-00174-RHB  (A.C. at ¶ 41).

A plaintiff in a RICO case may plead a scheme or artifice to intentionally defraud another

using either the mails or an electronic communication.  *VanDenBroeck v. CommonPoint Mortgage*

*Co.*, 210 F.3d 696, 701 (6th Cir. 2001).  Moreover, the allegations of mail and wire fraud must be

pled with specificity.  *Eby v. Producers Co-op, Inc.*, 959 F. Supp. 428, 431 (W.D. Mich. 1997).  The

complaint must within reason describe the time, place, and content of the mail and wire

communications and identify the parties to the communication.  *Advocacy Org. for Patients &*

*Providers v. Automobile Club Ins. Ass'n.*, 176 F.3d 315 (6th Cir. 1999); *see also, PayCom Billing*

*Services, Inc. v. Payment Resources International*, 212 F. Supp.2d 732, 734-38 (W.D. Mich. 2002)

(Chief Judge Robert Holmes Bell).   Here, Plaintiffs have made general references to mail and wire

fraud entirely lacking in description regarding the time, place and content of the mail and wire

communications, or the parties to the communications.  *See, Gepsen, Inc. v. Makita Corp.*, 34 F.3d

1321, 1328 (7th Cir. 1994).  Further, the Sixth Circuit has held that a false statement or omission of

fact must be made to the plaintiff, to support the claim of wire fraud or mail fraud as a predicate act

for a RICO claim and, further, that the plaintiff must have relied upon those statements to plaintiff's

detriment.  *Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181, 184 (6th Cir. 1993), *cert. denied*,

512 U.S. 1207 (citation omitted).  Simply stating that Tom Smith pled guilty to various criminal counts involving wire and mail fraud does not constitute sufficient notice to the New Era entities regarding what predicate acts they must defend against.  Even assuming the more relaxed standard of Fed. R. Civ. P. 8, the Receiver has failed to meet it.  Furthermore, Plaintiff has introduced no authority that specific requirements for compliance with stating a cause of action under a detailed statutory scheme should be relaxed because the court is sitting as a court of equity.  Because Plaintiff has failed to sufficiently allege the predicate acts, Plaintiff's claim for RICO conspiracy and aiding and abetting a RICO violation should also be dismissed.

9.      **The Receiver Has Stated a Claim for a Fraudulent Transfer**

Plaintiff asserts that "MIP" payments and payments "that occurred in the TradeArk transaction" should be avoided based on the state fraudulent transfer statutes.  The relevant provision of Michigan law provides as follows:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:
>
>> (a) With actual intent to hinder, delay or defraud any creditor of the debtor.
>>
>> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
>>
>>> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>>>
>>> (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Mich. Comp. Laws § 566.34

In the *Ponzi* case itself, the Supreme Court held that payments made from the co-mingled funds amassed in the course of such a scheme are inherently avoidable as fraudulent transfers. *Cunningham v. Brown*, 265 U.S. 1 (1924).

Michigan law defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  Mich. Comp. Laws § 566.31.  The facts asserted by Plaintiff, if proven, are sufficient to establish that the transactions at issue each involve transfers as that term is understood under Michigan law.  The ancillary complaint describes the transfers to be avoided, alleges that the entity making the transfers was insolvent, alleges that New Era provided less than reasonably equivalent value for the transfers, and identifies the legal basis for the Receiver's contention that the transfers should be avoided.

> Incorporating the above allegations by reference, the payments described above to New Era, particularly the MIP payments and those that occurred in the TradeArk transactions should be avoided based upon the state fraudulent transfer statutes.  The transfers occurred at a time when Trade Partners was insolvent or was engaged in business or a transaction for which its remaining assets were unreasonably small in relation to such business or transaction.  New Era provided less than reasonably equivalent value.  The transfers should be avoided pursuant to M.C.L.A. 566.34 and/or like provisions of applicable state law.

(A.C. at 9-12).

Taking the ancillary complaint as a whole, the Receiver has alleged that New Era participated over a period of years with TPI and its related entities in an elaborate shell game.  New Era has posited a hypothetical set of facts where the Receiver might lose its cause of action on the merits.  However, this does not support dismissing the claim at this point.

10.    **Greenville LLC and Gateway LLC's Claim for "Deepening Insolvency" Has Not Been Recognized by the Sixth Circuit or by Michigan Courts and Should Be Dismissed**

The parties have advanced no Sixth Circuit or Michigan case establishing that "deepening insolvency" is recognized as an independent tort either in the state of Michigan or in this circuit. It has been accepted by some courts as a tort when "an insolvent corporation suffers a distinct and compensable injury when it continues to operate and incur more debt" and treat it as an independent cause of action:

> "Deepening insolvency" refers to the "fraudulent prolongation of a corporation's life beyond insolvency," resulting in damage to the corporation caused by increased debt.

*In re Global Service Group, LLC*, 316 B.R. 451, 456 (Bankr. S.D.N.Y. 2004). In *Global*, the Chapter 7 trustee sued Atlantic Bank alleging that Atlantic Bank made loans to the debtor while the debtor was insolvent, and that the bank knew or should have known that the debtor would be unable to repay the loans, and that the loans were secured by the pledge of the assets of the principals of the borrower, that other creditors extended credit based on Atlantic's willingness to extend credit, and that the loans allowed by the debtor "to prolong its corporate existence and incur increased debt which would have been avoided without the Atlantic Bank loans." *Id.*, pp. 455-56. Atlantic Bank moved to dismiss. Although recognizing that theoretically an independent tort for "deepening insolvency" exists in some jurisdictions, the court ruled that the complaint failed to state a claim for deepening insolvency. Furthermore, New Era has submitted a supplemental brief regarding a recent case. In that brief, New Era argues that New Era Life, Midwest, and PALIC, three of the four New Era companies against whom the Receiver has asserted a deepening insolvency claim, are Texas corporations. The New Era entities claim therefore that their cause of action should be governed by

Texas law.  The parties have to this point made no assertions or done any briefing regarding which state's law should be applied.

However, the Court does not recommend that the Western District of Michigan create a new and separate cause of action in this already complicated and convoluted case where neither the Sixth Circuit nor Michigan courts have yet seen fit to do so.  Therefore, the Court recommends that the Receiver's claim based on deepening insolvency be dismissed.

11.     **The Doctrine of *In Pari Delicto* Should not Bar the Receiver's Claims**

The doctrine of *in pari delicto* should not constitute a bar to the Receiver's claims.  Indeed, the doctrine should not apply at all to a receiver in an equity proceeding.  *Scholes v. Lehmann*, 56 F.3d 750, 754-55 (7th Cir. 1995).  In the *Scholes* case, Chief Judge Posner explained that the doctrine should not control because the receiver's only object is to maximize the value of the corporation for the benefit of its investors and any creditors.  The opinion separates the scheme operator (that is, in this case, Tom Smith) from the corporation once the receiver has taken over.  The rationale behind the doctrine disappears.  The purpose of the doctrine is to not allow a wrongdoer to benefit from his wrongs.

Contrast the situation where the "wrongdoers" remain in control.  *Cf., Terlecky v. Hurd (In re Dublin Sec., Inc.)*, 133 F.3d 377, 380 (6th Cir. 1997); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 356-57 (3d Cir. 2001).  In the *Lafferty*, case, the Third Circuit found that the debtor's rights are determined under § 541(a) of the Bankruptcy Code "as of the commencement" of bankruptcy.  *Id.* at 356.  Wrongdoers were still in control of the debtors at the commencement of the bankruptcy cases, so the *in pari delicto* defense remained viable regardless of

post-bankruptcy events.  *Id.* at 356-57.  The Sixth Circuit has faced the same general fact pattern and reached the same result in *Dublin Sec.*, 133 F.3d at 379-80.

Here, the Receiver was appointed for TPI Desert Carmel, LLC and Trade Partners Greenville, LLC before those companies were placed into bankruptcy.  The rights of those companies should be determined as of the commencement of their respective bankruptcy cases.  Under the reasoning in *Scholes*, New Era's *in pari delicto* defense should have dissolved the moment the Receiver was appointed.  Therefore, the motion to dismiss the ancillary complaint should not be granted on this ground.

12.     **The Receiver Has Sufficiently Stated a Claim Against New Era Enterprises**

New Era contends that New Era Enterprises should be dismissed because a majority of the transactions in question were documented in the names of subsidiaries.  In fact, the ancillary complaint alleges joint and concurrent action by all of the New Era entities (A.C. at 3).  The ancillary complaint also offers the explanation that the officers involved wore multiple hats, and further makes clear that the allegations assert that all four New Era companies were alleged to have been acting unless specifically stated otherwise.  *Id.*  Again, this is not a summary judgment motion, and the ancillary complaint sufficiently alleges facts involving New Era Enterprises, so the motion to dismiss should be denied in this respect.

<u>CONCLUSION</u>

In summary, the Court recommends the following disposition of New Era's Motion to Dismiss the TPI Receiver's Ancillary Complaint (Dkt. 921):

1.     New Era's motion to dismiss the Receiver's objections to New Era's claims should be **denied**;

2.      New Era's motion to dismiss the Receiver's affirmative equitable subordination and recharacterization as equity claims should be **denied**;

3.      New Era's motion to dismiss the Receiver's cause of action for aiding and abetting breach of fiduciary duty should be **denied**:

4.      New Era's motion to dismiss the Receiver's cause of action for adding and abetting corporate waste should be **granted** subject to the Receiver's ability to seek reinstatement of it by submitting Michigan or Sixth Circuit authority that it is recognized as an independent cause of action in Michigan.  The Receiver should be ordered to submit any such authority within 30 days of the Court's order addressing objection to this Report and Recommendation.

5.      New Era's motion to dismiss the Receiver's conspiracy cause of action should be **granted** provided that ¶¶ 38 and 39 should be allowed to remain insofar as they provide an additional factual support for the Receiver's objections on any of the claims allowed to go forward.

6.      New Era's motion to dismiss the Receiver's RICO claims should be **granted**;

7.      New Era's motion to dismiss the Receiver's claim for fraudulent transfer should be **denied**; and

8.      New Era's motion to dismiss Greenville LLC and Gateway LLC's claims for deepening insolvency should be **granted**.

Respectfully submitted,

Date:  March 6, 2006              _/s/ Ellen S. Carmody_____
                                  ELLEN S. CARMODY
                                  United States Magistrate Judge

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).